EDISON ELECTRIC LIGHT & POWER CO. OF ST. PAUL et al. v. BLOMQUIST et al.

(Circuit Court, D. Minnesota, Third Division.   March 20, 1911.)

**1. MUNICIPAL CORPORATIONS (§ 703*) — STREETS — NATURE OF USE — MOVING BUILDING.**

The use of a public street for the moving of buildings is an extraordinary use for the sole benefit of the owner, and not an ordinary use for the benefit of the public, notwithstanding a city charter confers on the council the right to regulate the subject and the exercise of such right.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1509–1513; Dec. Dig. § 703.*]

**2. EMINENT DOMAIN (§ 13*) — USE OF STREETS — HOUSE MOVING — ELECTRIC WIRES—DISPLACEMENT—ORDINANCES.**

St. Paul City Ordinance March 31, 1910, requiring electric light and power companies, telephone, telegraph, and street railway companies at their own expense to remove or displace their wires lawfully in the street when a licensed house mover permitted to move a house through the streets requests them to do so, is invalid, in so far as it requires such companies having acquired the right to erect and maintain their poles and wires in the streets to cut or remove the same at their own expense to permit the moving of buildings, as a taking of private property for a private use.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 51–53; Dec. Dig. § 13.*]

**8. MUNICIPAL CORPORATIONS (§ 661*)—STREETS—REGULATION—ORDINANCES.**

St. Paul City Charter, c. 4, § 23, provides that the common council may by ordinance regulate and control the exercise by any person or corporation of any public right, franchise, or privilege in any of the streets and public places in the city, whether such right, franchise, or privilege has been or may be granted by the city or by or under the laws of the state or any other authority. St. Paul City Ordinance April 22, 1893, No. 1,675, § 16, grants to complainants the right to maintain poles and wires in the streets subject to all the ordinances of the city governing the occupancy of the streets, etc., and to all police regulations, and ordinance No. 2,424, approved January 21, 1904, requires that complainant gas company shall hold its franchise and exercise its privileges subject to all conditions and limitations in the charter. *Held*, that none of such provisions authorized the council to pass ordinance March 31, 1910, requiring electric, telephone, telegraph, and street railway companies to remove or displace their wires at their own expense on request of licensed house movers to allow the removal of houses along the streets.

[Ed. Note.—For other cases, see Municipal Corporations, Dec. Dig. § 661.*]

**4. EQUITY (§ 115*)—BILL—SUPPLEMENTAL BILL.**

Where a bill was filed against defendant B. to restrain him from interfering with complainant's wires located in the streets of the city for the purpose of moving a house along the streets, and by supplemental bill other house movers, who were moving another house under a separate

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

permit, obtained from the city over the same route but in the rear of the houses being moved by B., were sought to be joined as parties, but there was no proof that they were in any way connected with B. in moving the first house nor he with them in moving the second, or that such additional defendants had any claim or interest in the subject-matter of the original suit, the supplemental bill would be dismissed.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 280–283; Dec. Dig. § 115.*]

In Equity. Suit by the Edison Electric Light & Power Company of St. Paul and another against W. J. Blomquist and others. On motion for a temporary injunction. Granted.

W. D. Mitchell, for complainants.
Wondra & Helm, for defendants.

WILLARD, District Judge. On March 31, 1910, the common council of the city of St. Paul passed an ordinance requiring electric light and power companies, telephone, telegraph, and street railway companies at their own expense to remove or displace their wires lawfully in the street when a licensed house mover, who had procured a permit from the city authorities to move a house through the streets, requested them to do so. This bill was filed to restrain Blomquist, a house mover, from interfering with the wires of the complainants in the streets of St. Paul, and to restrain the city authorities from enforcing the ordinance; and it is now before the court upon the complainants' motion for a temporary injunction.

The law governing the rights of city councils to regulate public service corporations is not doubtful. In Northern Pacific Railway v. Duluth, 208 U. S. 583, 28 Sup. Ct. 341, 52 L. Ed. 630, it appeared that the railway company, after considerable negotiation with the city, in which it denied its obligation to build a viaduct, in 1891 entered into a contract with the city, which contract provided that the city should build the viaduct, and that the railway company should contribute to the expense of its construction $50,000. The city undertook for a period of 15 years to maintain the bridge over the railway's right of way. In 1903, the viaduct and its approaches having become dangerous to public use, the city adopted a resolution requiring the railway company to repair the bridge, and commenced proceedings by mandamus to compel it to make such repairs. It was held by the Supreme Court that the railway company could be compelled at its own expense to repair the viaduct, notwithstanding the contract previously made.

In West Chicago Railroad v. Chicago, 201 U. S. 506, 26 Sup. Ct. 518, 50 L. Ed. 845, it appeared that the railroad company under the authority of the city council of Chicago had built a tunnel under the Chicago river. After the completion of this tunnel, it became necessary to deepen the channel of the river, for the purpose of public navigation, and to lower the tunnel. It was held that the ordinance of the city requiring the railroad company to do this at its own expense was valid. The court said, on page 526 of 201 U. S., on pages 523, 524 of 26 Sup. Ct. (50 L. Ed. 845):

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

"What the city asks, and all that it asks, is that the railroad company be required, in the exercise of its rights and in the use of its property, to respect the public needs as declared by competent authority, upon reasonable grounds, to exist. This is not an arbitrary or unreasonable demand. It does not, in any legal sense, take or appropriate the company's property for the public benefit, but only insists that the company shall not use its property so as to interrupt navigation."

In New Orleans Gas Co. v. Drainage Comm., 197 U. S. 453, 25 Sup. Ct. 471, 49 L. Ed. 831, it was held that the changing of the location of gas pipes, at the expense of the gas company, under the streets to accommodate a system of drainage, did not amount to a deprivation of property without due process of law.

In Cincinnati, Indianapolis & Western Railway Company v. City of Connersville (Supreme Court, November 28, 1910) 218 U. S. 336, 31 Sup. Ct. 93, 54 L. Ed. 1060, the court said:

"The question as to the right of the railway company to be reimbursed for any moneys necessarily expended in constructing the bridge in question is, we think, concluded by former decisions of this court. * * * The railway company accepted its franchise from the state, subject necessarily to the condition that it would conform at its own expense to any regulations, not arbitrary in their character, as to the opening or use of streets, which had for their object the safety of the public, or the promotion of the public convenience, and which might, from time to time, be established by the municipality, when proceeding under legislative authority, within whose limits the company's business was conducted."

In all of the cases above referred to there was no doubt but that the expense required was for a public purpose. In the Duluth Case it was for the purpose of making a street safe for general traffic; in the Chicago Case it was for the purpose of making a river deep enough for navigation; in the New Orleans Case it was for the purpose of preserving the health of the city; and in the Connersville Case it was for the purpose of opening a street for the purpose of public travel.

Where, however, a city ordinance or a state law requires something to be done by a public service corporation at its own expense, which is for a private purpose, such ordinance or law does deprive the company of its property without due process of law.

In Missouri Pacific Ry. v. Nebraska, 217 U. S. 196, 30 Sup. Ct. 461, 54 L. Ed. 897, it appeared that a statute of Nebraska required railroad companies at their own expense to construct side tracks to the outer edge of their right of way, whenever required to do so by a person who had erected a grain elevator upon land adjacent to the right of way. This statute was held invalid. The court said, on page 206 of 217 U. S., on page 462 of 30 Sup. Ct. (54 L. Ed. 897):

"It is also true that the states have power to modify and cut down property rights to a certain limited extent without compensation, for public purposes, as a necessary incident of government—the power commonly called the police power. But railroads after all are property protected by the Constitution, and there are constitutional limits to what can be required of their owners under either the police power or any other ostensible justification for taking such property away."

And on page 207 of 217 U. S., on page 462 of 30 Sup. Ct. (54 L. Ed. 897):

"Why should the railroads pay for what, after all, are private connections? We see no reason."

While, as has been said, the law is not doubtful, yet the difficulty in this case is in determining in which class this suit falls. Some of the uses of a street are admittedly public, as that for travel over it; others are admittedly private, as the deposit of materials in the street in front of a lot on which a building is to be constructed, the use of the sidewalk for the display of goods, and the hanging of signs over a street. To which of these two classes does the removal of houses belong? The fact that the common council is given by the city charter the right to regulate this subject does not necessarily show that the use of the streets for the moving of houses is a public use. The council has the same right to regulate the deposit of building materials, the hanging of signs, and the use of the sidewalks by tradesmen.

No one would claim that the city would have a right to compel these corporations to remove at their own expense their poles set in the street in front of a lot, in order that the owner of the lot might deposit building materials on the street preparatory to erecting a house on it. The city could not compel the companies to remove at their own expense their poles and wires to allow the owner of buildings facing each other across an alley or a street to build a passageway over the street or alley for the purpose of connecting the two buildings. Townsend, Grace & Co. v. Epstein, 93 Md. 537, on page 555, 49 Atl. 629, on page 632 (52 L. R. A. 409, 86 Am. St. Rep. 441). In that case the court said:

"The corporation, the mayor and city council of Baltimore, is invested with the title to and control over the public streets. This control, however, is not arbitrary control. The streets and highways are held in trust for the benefit, use, and convenience of the general public. There are many ways in which the power to control and regulate the use of the streets can be and must be exerted by the municipality to meet the necessities and the convenience of an urban population; but the exertion of this power must have for its object a public purpose. It is not in accord with the trust upon which the municipality holds the streets, nor with the nature of the control which it has over them to make use of the power and authority with which it is invested in that regard to promote a mere private purpose, to subserve a mere private interest, or to subordinate the right of one citizen in the streets, or in a street of the city to the private interest and convenience of any other."

To use the language of that case: Was the ordinance complained of in this case passed to subserve a public purpose, or does it subserve a mere private purpose and private individual interests? Or, to use the language of the latest Supreme Court decision in the Connersville Case: Did the ordinance have for its object "the safety of the public, or the promotion of the public convenience"?

The defendant Blomquist says in his brief, on page 5:

"Thousands of citizens of the United States buy buildings for the purpose of moving them along the streets of cities. Municipalities oftentimes move buildings along their streets. It is a privilege granted to the public for its welfare so that it may pursue such reasonable and profitable investments or vocations as may be for their interest. If the right to move a house along the streets is denied to these defendants, the right is likewise denied to each citizen to remove his building and oftentimes in cases of necessity and the right is likewise denied to the municipality itself."

The same may be said of thousands of persons who build upon lots and deposit their materials on the street with the consent of the city. To hold that this ordinance is invalid would not be to hold that houses could not be moved through the streets. To hold that an ordinance is invalid which requires such companies as the complainants to move at their own expense their poles, in order to allow an owner to deposit building materials in the street in front of his lot, would not be to hold that material of that kind could not be so deposited. Such holdings would simply declare that the thing cannot be done at the expense of third persons.

For the purpose of illustration, it will be well to examine some of the facts in this case as disclosed by the evidence. The house to be moved is 31 feet wide, 40 feet long, and 40 feet high. It is to be moved 17 blocks, and passes over 13 street crossings, and at some 14 different places interferes with the complainants' wires. These carry a voltage, some of 110, some 220, some 2,200, and some 4,000, volts. They furnish current to 300 city arc lights. They furnish light or power to some 77 different persons or corporations. There is a dispute between the parties as to whether any or all of these wires would have to be cut and the current shut off; but it would seem that at least the wires carrying a voltage of 2,200 and 4,000 volts would have to be cut, stopping the current.

In addition to the inconvenience to the complainants and their patrons, it appears that the house will cross the tracks of the street car company whose wires will have to be cut or displaced. In addition to all this, there is the inconvenience to public travel on foot and in vehicles caused by the obstruction of the streets, resulting from the removal of the house through them. Similar inconveniences are suffered by the general public in all such cases. The only person benefited is the owner of the house.

The use of streets for moving houses is an extraordinary and unusual one. Edison Light & Power Company v. Blomquist, 110 Minn. 163, on page 167, 124 N. W. 969, on page 970. The court, moreover, in that case said:

"Authority to use the streets for the erection of poles and wires, and for moving houses, is vested in the city authorities, and without such authority there is no right. Eureka City v. Wilson, 15 Utah, 53 [48 Pac. 41]; Wilson v. Eureka City, 173 U. S. 32 [19 Sup. Ct. 317, 43 L. Ed. 603]."

In Wilson v. Eureka City, 173 U. S. 32, 19 Sup. Ct. 317, 43 L. Ed. 603, there was a refusal on the part of the mayor to allow the building to be removed at all. The ordinance permitting such action on the part of the mayor was upheld by the Supreme Court of Utah.

Streets are dedicated to public uses. A city council may regulate their use for public purposes, but it cannot prohibit such use. As the council can absolutely prohibit the moving of houses through them, how can it be said that such a use of the streets is a public use?

In Kibbie v. Landphere, 151 Mich. 309, 115 N. W. 244, 16 L. R. A. (N. S.) 689 (1908), the telephone company was occupying the streets of the village of Paw Paw by virtue of section 6691 of the Compiled Laws, which gave it that right, with this proviso:

"That the same shall not injuriously interfere with other public uses of the said places."

The court cited authorities to the effect that the use of the street, for moving houses was not a usual, but an extraordinary and unusual, one. It then said on page 313 of 151 Mich., on page 245 of 115 N. W. (16 L. R. A. [N. S.] 689):

"We come to the question whether the use of streets for the purposes of moving buildings is within the uses reserved in the statute. The authorities already cited answer this proposition in the negative."

And later said:

"The use defendants proposed to exercise was an unusual and extraordinary use and was not 'such other public use' contemplated by the statute."

In Northwestern Tel. Ex. Co. v. Anderson, 12 N. D. 585, on page 591, 98 N. W. 706, on page 708 (65 L. R. A. 771, 102 Am. St. Rep. 580), the court said:

"The use of the streets for moving houses is not, however, a usual, but is rather an extraordinary one. It does not pertain to the primary right to the use of the streets for travel or other public purposes. The public derives no benefit therefrom generally."

And on page 594 of 12 N. D., on page 710 of 98 N. W. (65 L. R. A. 771, 102 Am. St. Rep. 580):

"To compel plaintiff to remove its wires or repair them whenever called upon to do so by persons moving houses would add a burdensome and unreasonable condition to the ordinance under which it acts, not contemplated by its terms as passed."

In Dickson v. Kewanee Electric Light & Motor Company, 53 Ill. App. 379, the court charged the jury as follows:

"The jury are instructed that the use of a street for moving houses is not within the rights enjoyable by the public in a public street."

That instruction was affirmed.

In Ft. Madison Ry. Co. v. Hughes, 137 Iowa, 122, on page 126, 114 N. W. 10, on page 12 (14 L. R. A. [N. S.] 448), the court said:

"But, where the use of the street has been lawfully appropriated in so far as essential for the operation thereon of an electric street railway, one of the modern conveniences of travel and transportation, there is no tenable ground for demanding that its operation shall cease or be unduly interfered with, or that the value of its franchise shall be impaired or its property destroyed to enable another to make an unusual and extraordinary use of the street in the moving of houses or other structures over it. This would be inconsistent with the franchise granted to which the street has become subject. The rights of the defendants to the use of the street were limited by those of the company to operate its cars thereon, and they could not insist upon the elimination of its franchise rights in order to give way to them over the road in moving the house. In other words, the defendants had the right to the use of the street as it was, with the trolley line in operation, and not as it would have been had no franchise been granted by the city of Ft. Madison; and, as they could not move the house lengthwise on the street as they intended without occupying the company's track, destroying the trolley line, and interrupting for a considerable time the operation of its cars, the jury was rightly instructed that they were not entitled to take the house into that street."

**In** Williams v. Citizens' Railway Company, 130 Ind. 71, on page 76, 29 N. E. 408, on page 410 (15 L. R. A. 64, 30 Am. St. Rep. 201), the court said:

"That the demand in this case is an extraordinary one is shown by the authorities to which we have here referred, but it may be made more plain by simply saying that the purpose for which highways are laid out and dedicated is that of travel in the usual modes. It would be strange, indeed, if large buildings could be moved along the thronged streets of a city without control or restriction; and it would be equally strange if the owner of a building could destroy the property of others in order to enable him to move his building from one place to another."

This question again appeared in that court in Indiana Railway Company v. Calvert, 168 Ind. 321, 80 N. E. 961, 10 L. R. A. (N. S.) 780. This case supports the contention of the defendant Blomquist, and seems to be in conflict with the case of Williams v. Citizens' Railway Company above cited. The case of Calvert was an action by the street car company to recover damages occasioned to it by the moving of a house along one of the streets occupied by the company's tracks and wires. An ordinance of the city declared it to be the duty of the company to so raise or move its wires as to allow a building to pass. The company refused to do that, and Calvert loosened four span wires in order to push the north trolley wire to one side, and when the house was moved across the track he lifted the trolley wire to pass under it. He promptly reattached the span wires and moved the house without any unnecessary damage to the appellant. The amount of damages suffered by appellant was $87.50; but it is apparent, from what is said in the case, that almost all of that damage was caused by interference with the business of the company, and not by any physical injury to its property, for the court says, on page 332, of 168 Ind., on page 965 of 80 N. E. (10 L. R. A. [N. S.] 780), that "the damage is a minor and inconsequential one."

In deciding the case the court refers to its own decisions holding that a city council had a right to allow the streets to be obstructed by building material; and it evidently held that the ordinance relating to the removal of houses and the cutting or displacing of wires of the street car company was within the principle of those decisions. The court said, on page 332 of 168 Ind., on page 965 of 80 N. E. (10 L. R. A. [N. S.] 780):

"The ordinance in the case before us merely calls on the company temporarily to raise or remove its wires so as to allow the building to pass, and, as a consequential effect, to submit, with the rest of the public, to a disturbance of traffic in some degree. It is clear that this does not constitute a technical taking of property, as that term is used under the law of eminent domain (Richmond, etc., R. Co. v. Richmond, supra [96 U. S. 521, 24 L. Ed. 734]; Mugler v. Kansas [1887] 123 U. S. 623, 8 Sup. Ct. 273, 31 L. Ed. 205), and, as the damage is a minor and inconsequential one, done under the police power, we are of opinion, so long as the interference cannot judicially be said to be unreasonable, that there is no right to damages, as it is a case wherein the company is merely controlled in the use of its property by a governmental regulation."

But whether the damage in a case of this kind is small or great does not seem to be the determining factor. If the company can be compelled to move its wires at expense to itself, it can be compelled to

move its poles. If the moving of a house through the streets is a public use of the streets, then the companies can be made to submit to any expense, however great. The lowering of the tunnel in Chicago must have been done at great expense. The relaying of the pipes in New Orleans must have been very burdensome. On the other hand, the expense of building the side track in the Nebraska Case was comparatively trifling, $450. In no one of these cases was the amount of the expense considered at all important. It was held that a state could not deprive a corporation of its property for a private purpose, without compensation. If the state cannot compel companies to expend $100,000 for these purposes, it cannot compel them to expend $10.

The late Senator Davis of Minnesota, in arguing a question somewhat similar, said:

"It is no answer that the infraction is slight, or that it might be worse, or that it may be mitigated, or that it is a case for damages, or that a similar injury has before been tolerated."

The defendant Blomquist also relies upon the case of Crawford v. Tri-State Telephone & Telegraph Company, decided in the district court of Hennepin county, Minn. The well-known ability of the distinguished judge who tried that case entitles it to great consideration; but he himself in his opinion says that the question is not clear from doubt, and states that he relies particularly upon the case of Indiana Railway Company v. Calvert. For the reasons stated, I cannot agree with the result in that case, and consequently not with the result reached in the Hennepin county case.

The defendant also cites the case of Richards Building Moving Company v. Boston Electric Light Company, 188 Mass. 265, 74 N. E. 350. In that case a statute of the state requiring the defendant to cut its wires was sustained; but it seems that this provision was contained in the statute which gave to companies like the defendant a right to occupy the streets with their wires, and in the act which created the right was this express limitation thereon.

After a somewhat careful examination of the case in all its bearings, and of the authorities which have been cited on both sides, I can come to no other conclusion than that the occupation of a public street by a house that is being moved is similar in its nature to the occupation of a street by a deposit of building material. Both are obstructions to the street; both are done under the permission of the city council; both can be prohibited by the city council. In my judgment, both are for the private benefit of the person in whose favor they are allowed. Neither one is for a public purpose, and, consequently, any ordinance of the city requiring the complainants to incur expense or pay out money, to allow the removal of a house, would appropriate their property for a private purpose, and would be unlawful.

The defendant Blomquist, however, relies upon certain provisions of the ordinances under which he claims the complainants are occupying the streets. The general rights of a corporation which under a franchise from a city has erected poles and strung wires through

the streets are declared, so far as this state is concerned, in the case of Northwestern Telephone Exchange Company v. City of Minneapolis, 81 Minn. 140, 83 N. W. 527, 86 N. W. 69, 53 L. R. A. 175. The ordinance granting the Light & Power Company its right is ordinance No. 870 passed on August 19, 1886. This contains only two conditions binding on the company. One is that the city may at any time order the removal of the poles and wires, and the other is that the city may at any time order the wires placed under ground. Neither one of these conditions has anything to do with this case.

This defendant also relies upon ordinance No. 1,675, approved April 22, 1893, and particularly on section 16 thereof, which provides, in part, as follows:

"The grantees herein, their successors and assigns, shall at all times be subject to and comply with all the ordinances of the city of St. Paul now in force, or that may be hereafter passed, governing the use and occupancy of streets of said city, subject only to the limitations herein provided, and shall comply with all police regulations now in force or hereinafter enacted."

Ordinance 2,424, approved January 21, 1904, which relates particularly to the Gaslight Company, declares in section 21 that its franchise shall be held and exercised subject to all the conditions and limitations in said charter prescribed. Section 23 of chapter 4 of the charter provides that the common council may by ordinance provide for regulating and controlling the exercise by any person or corporation of any public right, franchise, and privilege in any of the streets and any public places in said city, whether such right, franchise, or privilege has been or may be granted by said city, or by or under the laws of the state of Minnesota or any other authority.

As to all of these provisions it is sufficient to say that no one of them does or can authorize the council to pass an ordinance taking the property of the complainants for a private purpose. The claim of defendants' counsel is that the ordinances constituted a contract between the complainants and the city to such an extent that under them the city would have a right to require complainants to furnish light and power to a private person for nothing. I cannot assent to this proposition.

J. C. Michael, Esq., has appeared for himself and the other defendants the city, Keller, and Burns. At the hearing upon the application for this injunction Mr. Kirby, a representative of the city attorney, appeared and stated that these defendants would take no part in the hearing, and would remain neutral as between the complainants and the defendant Blomquist.

Upon the filing of a bond for $2,000, a temporary injunction will be granted against the defendant Blomquist, his agents and employés, restraining them from cutting or displacing any of the wires mentioned in the bill of complaint, and restraining them and the city of St. Paul, its officers and attorneys and each of them, from instituting or prosecuting in the courts of said state any proceedings, criminal or civil, for the enforcement of the ordinance of March 31, 1910, when the only act charged against said complainant in said proceedings is that they have refused to cut or displace said wires at their own expense.

There remains to be considered the supplemental bill which was filed March 8, 1911. This bill brings into the case three new defendants, Schenstad, Ebinger, and Rundlett. On March 9th an order was entered making these persons parties, and a subpœna was ordered to be issued for service upon them. Schenstad and Ebinger appeared specially and objected to the jurisdiction of the court, on the ground that there is another action pending for the same cause in the state court. Schenstad and Ebinger are house movers, and it appears that they are moving another house under a separate permit obtained by them from the city. Upon all the evidence now presented, I cannot find that they are in any way connected with Blomquist in moving the first house, nor is he in any way connected with them in moving the second house. It does appear, however, that the two houses are owned by the same person, and that one is to be moved behind the other and over the same route.

The evidence does not show that Schenstad and Ebinger have or claim any interest in the subject-matter of the original suit. Under such circumstances, the supplemental bill cannot be maintained against them, and therefore can furnish no ground for a temporary injunction.

The restraining order entered against Schenstad, Ebinger, and Rundlett on March 9, 1911, is hereby vacated and set aside.