MINNEAPOLIS ST. RY. CO. v. CITY OF MINNEAPOLIS et al.

(Circuit Court, D. Minnesota, Fourth Division. April 21, 1911.)

**1. STREET RAILROADS (§ 28\*)—FRANCHISES—CONSTRUCTION.**

The right of a city granting a street railway franchise subject to the right at any time to designate any other line of railway in the city as demanded by the public necessities, and to extend any existing line, and, on the failure of the company to construct and put in operation any line demanded within a reasonable time fixed by the council, to grant to any other company the right to construct and operate a street railway in the streets so designated, can only be exercised by an order which fixes the time within which the company must construct and operate any line ordered, and, before the council may give another company the right to maintain a car line on any street in which a line has been ordered, it must determine the time within which the company must complete the work.

[Ed. Note.—For other cases, see Street Railroads, Dec. Dig. § 28.\*]

**2. STREET RAILROADS (§ 28\*)—FRANCHISES—ENFORCEMENT—REMEDY OF MUNICIPALITY.**

The sole remedy of a city granting a street railway franchise subject to the right to designate other lines of railway and to extend any existing line, subject to the right to grant to any other company the exclusive right to operate a street railway in the streets so designated on the company failing to comply with the extensions demanded, is on the failure of the company to comply with extension orders, by granting to some other company the right to operate cars on streets on which extensions or new lines have been ordered.

[Ed. Note.—For other cases, see Street Railroads, Dec. Dig. § 28.\*]

**3. CONSTITUTIONAL LAW (§ 241\*)—EQUAL PROTECTION OF THE LAW—MUNICIPAL ORDINANCES—VALIDITY.**

An ordinance directing a street railway company to construct and equip tracks on designated streets and put the same in operation does not deny the equal protection of the law to the company which accepted a franchise, giving the city the right to designate other lines or the extension of existing lines as demanded by public necessities.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 700, 701; Dec. Dig. § 241.\*]

**4. INJUNCTION (§ 144\*)—RESTRAINING ENFORCEMENT OF MUNICIPAL ORDINANCES—PLEADING.**

One suing to restrain the enforcement of a municipal ordinance may allege extraneous facts showing that the ordinance is in fact void, and the allegations of the bill must be taken as true on motion for temporary injunction.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 316, 317, 321; Dec. Dig. § 144.\*]

**5. CONSTITUTIONAL LAW (§ 133\*)—IMPAIRING OBLIGATION OF CONTRACT—FRANCHISES—ORDINANCE.**

An ordinance granting a street railway franchise required the company at its own expense to remove its tracks when the city desired to make any improvement on the streets including the laying of sewers, and reserved to the city the power to designate any other line of railway or an extension of any existing line as demanded by the public necessities. A subsequent ordinance, accepted by the company, provided that sewers should be built in streets before new lines should be ordered or existing lines be extended, and later such ordinance was amended so as to omit all reference to sewers. *Held*, that the amended ordinance was binding on the company though not accepted by it, because the amendment was an exercise of the power of the city to regulate the manner of carrying

---

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

on the business of the road and the use of the streets, and hence an ordinance directing the construction of a line over a street in which there were no sewers was not invalid as impairing the obligation of a contract.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 376; Dec. Dig. § 133.*]

**6. CONSTITUTIONAL LAW (§ 297*)—DUE PROCESS OF LAW.**

Such ordinance was not invalid as depriving the company of its property without due process of law.

[Ed. Note.—For other cases, see Constitutional Law, Dec. Dig. § 297.*]

**7. STREET RAILROADS (§ 28*)—ORDINANCES—EXTENSIONS—VALIDITY.**

Where a street railway franchise reserved to the city the right to direct the construction of new lines and the extensions of existing lines, when demanded by public necessities, an ordinance directing the construction of tracks nine miles in length could not be adjudged invalid as arbitrary and unreasonable, on the ground that the public necessities did not demand the work, the city council having determined that public necessities demanded the work, and the general manager of the company stating that 9½ miles of extensions during the year would not be unreasonable, but within the power of the company to make.

· [Ed. Note.—For other cases, see Street Railroads, Dec. Dig. § 28.*]

**8. CONSTITUTIONAL LAW .(§ 133*)—DUE PROCESS OF LAW—IMPAIRING OBLIGATION OF CONTRACT—STREET RAILWAY EXTENSION—MUNICIPAL ORDER.**

A street railway company accepting a franchise to operate a street car system in a city, subject to the right of the city at any time to designate other lines of railway as demanded by public necessities, or the extensions of existing lines, with the right of the city to grant to any other company the exclusive right to construct and operate a street railway in streets so designated on the company failing to comply with the orders of the city, may be put to its election on the adoption of an extension ordinance as to whether it will build the line ordered or allow another company to build it, and any future action by the city in exercising its rights under the franchise is within the scope of the franchise, and will not deprive the company of its property without due process of law nor impair the obligation of a contract.

[Ed. Note.—For other cases, see Constitutional Law, Dec. Dig. § 133.*]

**9. CONSTITUTIONAL LAW (§ 115*)—OBLIGATION OF CONTRACTS—LEGISLATURE.**

Resolutions or orders of a city directing a street railway company to construct new lines or extend existing lines are legislative acts, within the rule that a legislative act may not impair the obligation of a contract.

[Ed. Note.—For other cases, see Constitutional Law, Dec. Dig. § 115.*]

**10. STREET RAILROADS (§ 65*)—REGULATIONS—MUNICIPAL AUTHORITY.**

A city granting a street railway franchise may, within the police power, regulate the service for public convenience, safety, or health.

[Ed. Note.—For other cases, see Street Railroads, Dec. Dig. § 65.*]

**11. STREET RAILROADS (§ 70*)—REGULATIONS—ORDINANCES—VALIDITY.**

An ordinance of a city limiting the number of passengers on each street car to 75, and imposing a penalty for its violation, is a valid exercise of the power of the city to regulate street car service of a company having a franchise to operate a street car system in the city.

[Ed. Note.—For other cases, see Street Railroads, Dec. Dig. § 70.*]

**12. STREET RAILROADS (§ 70*)—REGULATIONS—ORDINANCES—VALIDITY.**

A provision in a city ordinance limiting the number of passengers on street cars that the company shall post in its cars the number of people to be reasonably carried in each car is valid.

[Ed. Note.—For other cases, see Street Railroads, Dec. Dig. § 70.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**13.** STREET RAILROADS (§ 70*)—REGULATIONS—ORDINANCES—VALIDITY.

An ordinance requiring a street railway company, having a franchise to operate street cars in a city subject to the duty to furnish and run a sufficient number of cars to accommodate the traveling public on all streets which they occupy for railway purposes, to continuously provide and operate on each car line a sufficient number of passenger cars to receive and carry all persons desiring transportation without admitting into the car more passengers than the carrying capacity thereof, does no more than declare obligations imposed on the company by the franchise, and is not invalid as subjecting the company to a forfeiture of its franchise for failure to comply with the ordinance.

[Ed. Note.—For other cases, see Street Railroads, Dec. Dig. § 70.*]

**14.** MUNICIPAL CORPORATIONS (§ 661*)—CONTROL OF STREETS—POLICE POWER.

Where the state commits to a city the care of its streets and the enforcement of all regulations for controlling the operation of street cars thereon, the city has the exclusive right to regulate the streets, not only for the people who live there, but for all who come there.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1432, 1434–1437; Dec. Dig. § 661.*]

**15.** STREET RAILROADS (§ 70*)—REGULATIONS—ORDINANCES.

An ordinance providing that when any passenger shall be admitted into any street car in excess of the carrying capacity thereof as defined, the company shall forfeit a specified sum for each passenger so admitted, merely provides for a penalty for receiving persons in excess of the specified number, without requiring or authorizing it to receive more than such number, and the ordinance is valid.

[Ed. Note.—For other cases, see Street Railroads, Dec. Dig. § 70.*]

**16.** STREET RAILROADS (§ 70*)—REGULATIONS—ORDINANCES.

A city ordinance which prohibits a street railway company from admitting passengers on any of its cars in excess of the carrying capacity of the car as defined, relates only to the city, and only prohibits the company while in the city from taking on passengers after the prescribed number has been reached, and is not invalid so far as it affects interurban business and the company may bring into the city a car carrying more passengers than the maximum.

[Ed. Note.—For other cases, see Street Railroads, Dec. Dig. § 70.*]

**17.** STREET RAILROADS (§ 70*)—REGULATIONS—ORDINANCES.

A municipal ordinance prohibiting a street railway company from admitting passengers into any of its cars in excess of the carrying capacity thereof as defined is not invalid for failing to provide for extraordinary occasions, and, where an extraordinary occasion arises, it may defend a violation by establishing the facts.

[Ed. Note.—For other cases, see Street Railroads, Dec. Dig. § 70.*]

**18.** STREET RAILROADS (§ 70*)—REGULATIONS—ORDINANCES.

The proviso in an ordinance fixing the maximum number of street car passengers, and imposing a penalty on the street car company for a violation thereof, that company shall not be liable to the penalty in any case wherein another car on the same line proceeding on the same track and in the same direction and containing fewer passengers than the carrying capacity, shall at the time be within 300 feet of the point where the excess passenger is admitted, does not impose any obligation on the company, and does not require it to run its cars 300 feet apart, but merely relieves the company from the obligation imposed on it in another part of the ordinance, and the proviso is not violative of the federal Constitution.

[Ed. Note.—For other cases, see Street Railroads, Dec. Dig. § 70.*]

**19. INJUNCTION (§ 85*)—ORDINANCES.**

An ordinance regulating street car service, and fixing the maximum number of passengers permitted on cars, must be obeyed at the expense of the street railway company, and it cannot restrain the enforcement of the ordinance on the ground that obedience to it will necessitate an enormous expense where the claim that such expense will be incurred results from an erroneous construction of the ordinance.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 155, 156; Dec. Dig. § 85.*]

**20. INJUNCTION (§ 144*)—PLEADINGS—CONSTRUCTION.**

Though a motion for temporary injunction to restrain the enforcement of a municipal ordinance must be determined by the allegations in the bill, yet where the allegations are based on an unwarranted construction of the ordinance, the court must disregard the allegations.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 316, 317, 321; Dec. Dig. § 144.*]

In Equity. Suit by the Minneapolis Street Railway Company against the City of Minneapolis and others. Motion for temporary injunction denied.

N. M. Thygeson and J. C. Michael, for complainant.

D. Fish, for defendants.

WILLARD, District Judge. After hearing the arguments of respective counsel, the court rendered the following decision, orally:

I will follow the order pursued by counsel, and in discussing the two branches of this case, I will take up first the so-called construction and extension ordinances.

[1] Section 3 of the original ordinance of 1875 provides as follows:

"The city council may at any time designate any other line of railway in the said city as a line demanded by the public necessities; and may also designate an extension of any existing line or lines.

"And in case said company, upon being notified of such designation shall not within such reasonable time as shall be fixed by the city council, construct and put in operation such line, then the city council may charter to any other company the exclusive right to construct and operate a street railway in the street or streets so designated."

I eliminate from this discussion all the ordinances passed prior to 1911. I do so, because in all of them, except two, there is no attempt whatever to fix any time within which the street railway company must complete the line. These ordinances on their face, so far as they are an attempted compliance with section 3 of the ordinance of 1875 are completely null and void, impose no obligation or liability upon the company, and furnish no ground for the claim on the part of the company that they impair in any way the obligation of its contract with the city, or deprive it of its property without due process of law.

There is one ordinance which directs the company to commence construction forthwith, but that is not in compliance with the terms of section 3. The ordinance relating to the Franklin Avenue line requires the company to commence construction by April 1st, but nowhere in that ordinance is there any determination of the time within which the line shall be completed; and that is an essential feature of

section 3. Before the city council can give another company the right to maintain a car line upon any street in the city on which an extension has been ordered, it must determine the time within which the complainant company must complete such extension. That has not been done in any of these ordinances passed prior to 1911. They are all entirely worthless and inoperative, in so far as they attempt to impose any duty upon the railway company. I should require considerably more argument than I have heard now before I should be convinced that the street railway company, under the terms of the various ordinances now existing, could be compelled by the city to make any extensions, or to construct any new lines. My present opinion, which of course may be changed by future argument, is that there is no such power in the city. This point was not overlooked when the original ordinance of 1875 was made. Not only was there a provision with regard to new lines, but there was a provision in section 2 with regard to other lines, and that section expressly required the company to construct lines upon determined streets, required them to be completed within a specified time, and provided if they were not completed within that time that all the rights of the company given by the charter should be lost. But when they came to treat of extensions and new lines, while they provided that they might be ordered, they made no provision that the city council might compel their construction, neither did they make any provision if the new lines were not constructed and such extensions were not made that the company should forfeit all its rights under the charter. The remedy was made specific and was set forth in terms.

[2] The ordinance indicates plainly that the only remedy which the city had then, and has now, was and is the granting to some other company the right to maintain street cars upon these streets as to which extensions or new lines had been ordered. To my mind, that is the only remedy. There is no power in the city council to compel the construction of these new lines. It is said that that remedy is valueless, that it is worthless; that no other company would take a charter to construct these extensions or new lines. Whether this is true or not is of no importance. The parties made the contract as it now is, and they are bound by it. But it may be added that at the time the contract was made it was not an absolutely inadequate remedy. Those were the days of horse cars. They were not the days when street railways were operated from a central plant which required the expenditure of an enormous amount of money for its construction.

There is, moreover, another provision in section 4 of the ordinance which makes the remedy apparently of more value than it appears on its face to be. That section specifically provides that any company to which a charter was granted to construct lines on a street in which the present company refused to make construction should have the right to use the rails and tracks of the old company under such terms as might be determined by the district court of Hennepin county. So I do not think it can be said that when that contract was made it was entirely one-sided. I say this is my present opinion upon that

branch of the case; but it is not necessary to decide the question now, because in my judgment we have not yet reached it.

It is claimed by the complainant that the four or five—four, I think —ordinances passed in 1911 are void because they impair the obligation of the contract between the company and the city, because they deprive the company of its property without due process of law, and because they deny the company the equal protection of the law.

[3] I shall dismiss the last claim without any further consideration, because I think there is absolutely nothing in it. But upon the first two claims it is necessary to consider the precise terms of the ordinances which are thus assailed. I will take as an example Exhibit M. That ordinance was approved on the 17th day of March, 1911, and provides for an extension of the line upon Plymouth avenue, from the terminus of the present car line on said avenue west to Sheridan avenue.

The ordinance commences by declaring:

"That street car service is demanded by the public necessities upon the following named avenue."

—and then says:

"That the Minneapolis Street Railway Company be and it is hereby authorized and directed to lay, construct, and equip a double track electric street railway upon and over said Plymouth avenue," etc., "and to put the same in operation within the period hereinafter prescribed, as a part of its city street car system."

The ordinance further provides (and I call it an ordinance although it is denominated a resolution):

"That the period of five months immediately following the passage of these resolutions be and is hereby declared to be, in the judgment of this council, a reasonable time within which to complete said construction and equipment."

That is all there is of the ordinance. It does not in any way indicate what the city proposes to do if the company does not comply with the ordinance. It does not order or direct any officer of the city to take any action whatever. It simply declares that the public necessities demand this construction, fixes the time within which the construction shall be made, and orders the company to make it.

Now, wherein does that ordinance impair the obligation of the contract between the company and the city, or in what way does it deprive the company of its property without due process of law? It is an ordinance—a resolution—passed in strict conformity with section 3 of the ordinance of 1875. But it is said that it violates the contract in the respects claimed, because upon some of these streets it is made to appear by the bill that sewers have not yet been laid; and it is claimed that by the terms of the contract between the parties no extensions can be ordered until sewers have been laid.

[4] Of course it is entirely proper for the orator to allege extraneous facts which show a resolution passed by the city council to be in fact void. So I must take the allegations of the bill with regard to the nonexistence of sewers upon any of these extensions to be true.

[5, 6] Legislation with regard to sewers appears in the original ordinance. By that ordinance the company was bound at its own expense to remove its tracks whenever the city desired to make any improvements on the streets, including the laying of sewers. But in the ordinance approved December 29, 1892, there is the following:

"Sewers shall be built in all streets before new lines shall be ordered, or existing lines shall be ordered extended thereon, and said company shall only be required to construct the lines so ordered between the 1st of April and the 1st of November."

That ordinance was accepted by the company, and the ordinance itself provided that it should not take effect until so accepted. It related to transfers, and why this matter of sewers was put in does not appear; but it was put in there, and of course it was binding upon the city as long as it stood there. But on July 28, 1893, an ordinance was passed over the mayor's veto, amending section 6, which was the section treated of in the ordinance of 1892, and as so amended the provision in regard to sewers was omitted; so that, as the law now stands, there is no provision requiring the city to lay sewers in the streets before the street car company can be ordered to construct new lines or extensions. It is claimed, however, by complainant that this ordinance of 1893 was never accepted by the company, and consequently, it cannot in any way affect the rights which were granted to it with respect to sewers by the ordinance of 1892. Upon that subject I consider the opinion of the Supreme Court in a case between these same parties, the City of Minneapolis v. Minneapolis Street Railway Company, 215 U. S. 417, 30 Sup. Ct. 118, 54 L. Ed. 259, as conclusive.

Section 8 of the ordinance of 1890 provides as follows:

"In the construction, maintenance and operation of said lines of street railway, said Minneapolis Street Railway Company, its successors and assigns, shall at all times be subject to all the conditions and limitations and other provisions of an ordinance entitled 'An ordinance authorizing and regulating street railways in the city of Minneapolis,' passed July 9, 1875, and approved July 17, 1875, as the same has been amended and is now in force, and all other ordinances of said city now in force or hereafter adopted, so far as applicable."

It was held in the case cited that that ordinance giving the city power to regulate by future ordinances the construction, maintenance, and operation of all lines did not give the city power to regulate fares, so as to infringe the contract, or take away what had been secured in that respect by the ordinance of 1875. Precisely what was meant by the words "construction, maintenance, and operation" was decided in that case, where it was said on page 435 of 215 U. S., page 125 of 30 Sup. Ct. (54 L. Ed. 259):

"The right to future control under section 8 was to include the 'construction, maintenance and operation' of the line of the street railway company. Did this undertaking have the effect to abrogate the contract right already existing, and to subject the company for the future as to the right to charge fares, to the discretion of the city council? Or, do the terms 'construction, maintenance and operation' have reference to the manner of carrying on the business of the road, the laying of its tracks, the use of the streets, the keeping up of the equipment, the safety of the passengers and the public,

and similar matters not involving the right to charge fares? We think these terms refer to the latter class of rights and privilges. Such is the import of the words used, and the subject of rates of fare is not mentioned."

I think that is conclusive upon this question. It is distinctly held there, as I understand it, that the city council has the right by future ordinances to regulate and control the manner of carrying on the business of the road, the laying of the tracks, the use of the streets, and the keeping up of the equipment. When we consider the meaning of the term "use of the streets," we must conclude that it includes the question whether the tracks should be laid before the sewers are put in, or after they are constructed. So I eliminate from the consideration of this matter the question with regard to sewers, because I consider that the ordinance of 1893 was binding upon the company, although not accepted by it.

[7] It is further claimed that the resolution or ordinance Exhibit M is invalid because it is arbitrary and unreasonable, because the public necessities do not demand any such extensions as are ordered. Upon that point it is important to notice that section 3 of the ordinance of 1875 provides that the city council may at any time designate any other line of railway in the said city as a line demanded by the public necessities. It would be going a great way for the court, after the council has determined that the public necessities do demand an extension, to say that they do not demand it. Of course, there may be cases where the action of the city council is so arbitrary and entirely unreasonable as to impose that duty upon the court. If, for instance, the city council should order the construction of a line of railway upon every street in the city, no court would for a moment hesitate to say that such action was arbitrary and unreasonable, and that such a burden could not be imposed upon the company. But that is not this case. Here the ordinances ordered extensions amounting to some nine miles of track, and the city council has declared that the public necessities demand such extensions. We have also evidence that the general manager of the street railway company has stated that 9½ miles of extensions during the present year (I do not remember the exact words), but that the expense of putting in that amount would not be unreasonable, and that it would be entirely within the power of the company to make such extensions. Under these circumstances it is impossible for me, and I think impossible for any court, to say that this ordinance Exhibit M, or the ordinances taken together, are so arbitrary and unreasonable as to deprive the company of its property without due process of law, or are such as would impair the obligation of the contract between the parties.

Reference has been made to the case of the Northwestern Telephone Company against the city of Minneapolis reported in 81 Minn. 140.[1] That was a case in which the city council had ordered that the wires of the Telephone Company be put underground through a large extent of territory in the city. It was alleged in the bill, as I remember (I have not examined the case for some months), that the action of the city council was arbitrary and unreasonable, and that the public necessities did not require any such action. To that bill there was a

1 83 N. W. 527, 86 N. W. 69, 53 L. R. A. 175.

demurrer and the court said, that the city, by its demurrer, admitted that the action was arbitrary and unreasonable. My understanding of the final decision in the case is that it was based upon the allegations contained in the bill.

[8] It is further said, admitting that the only remedy which the city has here is the right to grant to another company a franchise to make these extensions, that the city cannot put the company to its election now as to whether it will build, or will allow another company to build, them. But that is the very election which they agreed to make when they accepted the terms of section 3 of the original ordinance. They agreed, then, if the city should order an extension made which the public necessities demanded and it was not constructed within the time fixed, that the city council might grant to another company the right to make that extension.

[9] I assume for the purpose of the argument that these resolutions or ordinances are legislative acts, and I think they are, as a matter of fact. I think they go beyond mere executive or administrative action. They determine something which is within the legislative power. But with that assumption, in what way do they now impair the obligation of the contract, or in what way do they now deprive the company of its property without due process of law, assuming that they are invalid? The time when the city, if they are invalid, will deprive this company of its property will be when the council takes some future action against the company for its failure to comply with these resolutions. If the company does fail to comply with them, and the city council then grants a franchise to another company, the time will have arrived when the company could take some action, and it could then make a valid assertion that its contract rights have been impaired. If the order directing the construction was invalid, then the order granting the franchise would be invalid. Then would be the time for the company to bring such suit as this; but, in my judgment, that time has not yet arrived. The legality of these resolutions must be determined from what they show upon their face. It is only a legislative act that can impair the obligation of a contract. Such an act must be an act of the Legislature, or of some board which has been given by the Legislature legislative power. Ordinance Exhibit M relates simply to the building by the company of a new line. This is the only action which the council has taken. Any future action taken by an officer of the city, relying upon this ordinance, would be entirely without its scope, and would not be an act impairing the obligation of a contract, and would not deprive the company of its property without due process of law, for the ordinance on its face contemplates no future action.

The fourteenth amendment does not declare that no man shall be deprived of his property without due process of law, but that no state shall deprive any person of his property without due process of law. If an officer of the city without any legislative authority from the council or from the state undertake to deprive this company of its property without due process of law, its remedy is in the district courts

of this state, and it can there assert its rights against any one invading them.

There is an allegation in the bill that the city has threatened to forfeit the rights of the company to its franchises on the lines extended. But no such threatened action on the part of any city official would be warranted by this resolution Exhibit M. Upon this branch of the suit Des Moines v. City Railway Company, 214 U. S. 179, 29 Sup. Ct. 553, 53 L. Ed. 958, and also the case of the St. Paul Gas Light Company v. St. Paul, 181 U. S. 142, 21 Sup. Ct. 575, 45 L. Ed. 788, are in point.

The latest utterance upon the subject is found in the case of the Atchison, T. & S. F. Ry. Co. v. City of Shawnee, 183 Fed. 85. That being a determination of the Circuit Court of Appeals of this circuit; the decision is of course binding upon this court, but the resolution in that case goes much farther than the resolution in this case. It was there said:

"It is more than a mere declaration of the attitude of the city and a direction to its law officer to bring suit in court. It not only denies the company has any right or title to the street arising from a lawful vacation, but demands that it shall assume the burden of opening it up and restoring it to public travel. The resolution is militant, not merely declaratory."

In other words, it was a determination by the city of Shawnee that the railway company had no right whatever to a piece of land which it in fact owned. For these reasons I have come to the conclusion that the bill furnishes no authority at all for holding that the ordinances or resolutions to which I have referred, and which are limited as I said before to those passed in 1911, are null and void. They are in my judgment valid, and, being valid, there is no ground upon which a temporary injunction can be issued.

[10] That disposes of the first branch of the case, and I come now to the second branch, which relates to what is called the service ordinance. The law upon this subject is well settled, and I read from an opinion in the case of the Edison Electric Light & Power Company of St. Paul and St. Paul Gas Light Company v. Blomquist et al., 185 Fed. 615, rendered by me on the 20th of March of this year:

"The law governing the rights of city councils to regulate public service corporations is not doubtful. In Northern Pacific Railway v. Duluth, 208 U. S. 583 [28 Sup. Ct. 341, 52 L. Ed. 630], it appeared that the railway company after considerable negotiation with the city, in which it denied its obligation to build a viaduct, in 1891, entered into a contract with the city, which contract provided that the city should build the viaduct, and that the railway company should contribute to the expense of its construction $50,000. The city undertook for a period of 15 years to maintain the bridge over the railway's right of way. In 1903 the viaduct and its approaches having become dangerous to public use, the city adopted a resolution requiring the railway company to repair the bridge, and commenced proceedings by mandamus to compel it to make such repairs. It was held by the Supreme Court that the railway company could be compelled at its own expense to repair the viaduct, notwithstanding the contract previously made."

In West Chicago Railroad v. Chicago, 201 U. S. 506, 26 Sup. Ct. 518, 50 L. Ed. 845, it appeared that the railroad company under the

authority of the city council of Chicago had built a tunnel under the Chicago river. After the completion of this tunnel it became necessary to deepen the channel of the river, for the purpose of public navigation, and to lower the tunnel. It was held that the ordinance of the city requiring the railroad company to do this at its own expense was valid. The court said on page 526 of 201 U. S., pages 523, 524 of 26 Sup. Ct. (50 L. Ed. 845):

"What the city asks, and all that it asks, is that the railroad company be required, in the exercise of its rights and in the use of its property, to respect the public needs as declared by competent authority, upon reasonable grounds to exist. This is not an arbitrary or unreasonable demand. It does not, in any legal sense, take or appropriate the company's property for the public benefit, but only insists that the company shall not use its property so as to interrupt navigation."

In New Orleans Gas Co. v. Drainage Comm., 197 U. S. 453, 25 Sup. Ct. 471, 49 L. Ed. 831, it was held that the changing of the location of gas pipes, at the expense of the gas company, under the streets to accommodate a system of drainage, did not amount to a deprivation of property without due process of law.

In Cincinnati, Indianapolis & Western Railway Company v. City of Connersville (November 28, 1910) 218 U. S. 336, 31 Sup. Ct. 93, 54 L. Ed. 1060, the court said:

"The question as to the right of the railway company to be reimbursed for any moneys necessarily expended in constructing the bridge in question is, we think, concluded by former decisions of this court. * * * The railway company accepted its franchise from the state, subject, necessarily, to the condition that it would conform at its own expense to any regulations, not arbitrary in their character, as to the opening or use of streets, which had for their object the safety of the public, or the promotion of the public convenience, and which might, from time to time, be established by the municipality, when proceeding under legislative authority, within whose limits the company's business was conducted."

The court further said in that case:

"This court has said that 'the power, whether called police, governmental, or legislative, exists in each state, by appropriate enactments not forbidden by its own Constitution or by the Constitution of the United States, to regulate the relative rights and duties of all persons and corporations within its jurisdiction, and therefore to provide for the public convenience and the public good.' "

[11] Under that statement of what the law is, I come now to consider whether a simple ordinance limiting the number of people that the company can carry in its cars can be valid. Would an ordinance which only said that 75 people and no more should be carried in a car be valid? Upon that point I can entertain no doubt. It seems to me that it is clearly within the power of the city council, in the exercise of those functions which the state has committed to its care, to make such a provision. It is not necessary to discuss from a practical standpoint the evils which come or result from overcrowded street cars. An ordinance of that kind, saying no more than that the company should not receive more than 75 persons in one of its cars would be valid, and an ordinance which imposed a penalty for receiving more than that number would be also valid. I say 75 persons, and I say that

because 75 is about the number which the company can carry under this ordinance. There has been no claim from counsel that if the ordinance is valid the number 75 is an unreasonable number, and I assume that it is not unreasonable. The city council has determined that it is a reasonable number, and there has been no contention to the contrary. Such an ordinance as that being valid, the question is, Is the ordinance here sought to be enforced valid? I will take up the sections as they appear in the ordinance.

[12] No serious complaint is made as to section 1, which simply requires that the company post in its cars the number of people to be reasonably carried in each car. If such an ordinance is valid, I see no objection to that section.

[13] Section 2 provides that from and after April 15, 1911, between certain hours, "said Minneapolis Street Railway Company shall continuously provide and operate upon every part of each car line maintained by it within said city of Minneapolis a sufficient number of passenger cars to receive and carry all persons desiring transportation thereon, without admitting into any such car more passengers than the carrying capacity thereof. Provided, that for all the purposes of this ordinance two children under the age of six years, present in any car, may be counted as one adult."

What does that section contain more than is contained in one of the prior ordinances? When we turn to the original ordinance of 1875 we find that by section 12:

"It shall be the duty of the company to furnish and run a sufficient number of cars to accommodate the traveling public, on all streets which they shall use and occupy for railway purposes."

The city has the right to limit the number of people to be carried in each car; and section 2 of this ordinance does no more than section 12 of the ordinance of 1875, namely, to require the company to furnish cars for people desirous of transportation.

It is to be observed, and it is a very important point, that no penalty whatever is by this ordinance imposed upon the company for a failure to comply with section 2. No penalty was imposed upon the company by the original ordinance for a failure to comply with section 12. The company is not subject to any fine. But it is said that the company is subject to forfeiture, and that the state can commence an action if the company fail to perform the functions which it agreed to perform. That was exactly what the state could have done at any time, and this ordinance does not for the first time create that right. To say that this ordinance interferes with the right of the state to maintain such a proceeding is to say that which would not be justified either by the law or by the facts.

[14] The state has committed to the city of Minneapolis the care of its streets, and the enforcement of all regulations for controlling the operation of cars upon its streets. It has the exclusive right to regulate its streets, not only for the people who live here, but for all people who come here. The complainant's claim that a resident of Lac Qui Parle county coming to Minneapolis has rights in the streets given by the state which the city cannot take away is entirely unfounded.

[15] Now I come to section 3 of the ordinance which says:

"That whenever any passenger shall be admitted into any of said cars in excess of the carrying capacity thereof as in said ordinance defined, said Minneapolis Street Railway Company shall forfeit and pay to the city of Minneapolis the sum of $50 for each and every passenger so admitted."

I omit for the present the proviso in that section. What does that section provide so far? It provides no more than if the company receives persons in excess of 75 into a car it shall pay $50 for each person in excess of that number. There is nowhere found in that section any provision requiring or authorizing the company to receive more than 75 persons. It expressly forbids the taking into a car of more than 75 persons; and expressly forbidding that, of course it altogether abolishes and entirely puts to one side any obligation on the part of the street railway company to stop to take on passengers when there are more than 75 persons in a car. The street railway company with 75 persons in one of its cars has the right to refuse to carry any more passengers in that car.

Counsel speaks of the common-law obligation of the company to stop at crossings and take on passengers; but here the common-law obligation to do that has been modified and necessarily restrained, and practically abolished by this ordinance. The city council has the right to regulate the running of street cars in that respect. If it says in the exercise of its power, as it may say, that after 75 people are in a car no more shall be taken on, that would undoubtedly relieve the company of its obligation to stop and take on passengers. The company would have a perfect right to run a car from one end of the line to the other, if there are 75 people in it, without stopping anywhere except to allow passengers to alight. This ordinance does not require the company to stop a car after 75 people are in it, and imposes no penalty if it refuses to do so.

[16] It has been argued that the ordinance is invalid, because so far as interurban passengers are concerned, it would require the stoppage at the city line of a car having more than 75 persons in it coming from St. Paul, and the ejectment of some of the passengers. There is nothing whatever in the ordinance which would justify any such construction. It relates to the city of Minneapolis, and the only prohibition is that the company shall not in the city take on any passengers after the prescribed number has been reached. It does not prohibit them from bringing into the city of Minneapolis a car with 80 to 100 people on it.

[17] It has been suggested that this ordinance is defective in not providing for extraordinary occasions, such as football games, baseball games, grand opera, and entertainments of that nature, when there are a very large number of people to be carried. But the ordinance does not in any manner change the law in respect to those matters from what it is now. The law does not compel the company to take on these people if the car is crowded (and in contemplation of the law more than 75 passengers would crowd a car) under a penalty for not doing so; neither did the old law before this ordinance was passed make any such requirement.

It was suggested in the argument that on the occasion of a grand opera entertainment in St. Paul people from Minneapolis on one day all returned on the Selby-Lake line, which was swamped thereby, and that on the next day they all returned on the Como-Harriet line, and the consequence was that those cars were overcrowded. It was urged that it would be a great hardship if the street railway company were liable in that case for not furnishing cars sufficient to meet the demands of the traffic. Under the law as it stood at the time of this occurrence, the company was subject to a suit by the state for its failure to comply with section 12 of the ordinance of 1875. But in such a case it would have been undoubtedly a complete defense to show that the occasion was an extraordinary one. So, under the new ordinance, if there should be at an unusual hour or occasion an extraordinary demand for cars, and the company should not be able to furnish them, it would be liable to a suit by the state. But, it would be a complete defense to say that the demand was extraordinary. In any event, however, this ordinance nowhere imposes any penalty upon the company for a failure to furnish sufficient cars either for this or for any other occasion.

[18] Now, I come to the proviso contained in section 3, which declares as follows:

"Provided, that such payment shall not be required in any case wherein another car on the same line, proceeding on the same track and in the same direction and containing fewer passengers than the carrying capacity thereof, shall at the time be within 300 feet of the point where said excess passenger is admitted."

That, to my mind, is the weakest part of the ordinance, and shows that the city council expressly allowed the public to do what they refused to allow the street car company to do. They refused to allow the company to overcrowd its cars, but did allow the public to do so. I can see no reason whatever for any such proviso in the ordinance. If it is an evil to crowd 150 people into a car, it is just as much of an evil when there is another car within 300 feet as it is when there is another car following within 600 feet. I see no defense whatever for that proviso. But the fact that I see no reason for putting that proviso into the ordinance is no ground for saying that the whole ordinance is unreasonable, or that the company has been deprived of its property without due process of law, or that the ordinance impairs the obligation of the contract between the street car company and the city.

What does this proviso in fact require? It has been said that it requires the company to run its cars 300 feet apart during the hours named in the ordinance. I find no provision of that kind whatever in the ordinance. There is nothing in the ordinance in this section 3 or in the proviso, from which any such requirement as that can be spelled out. The ordinance in section 2 says that the company shall furnish cars sufficient in number for the convenience of the public; but it nowhere says that they shall be run 300 feet apart. The fact is that, so far from the proviso imposing an obligation upon the company, or depriving it of its property without due process of law, it relieves the company from the obligation imposed upon it in another

part of the ordinance. In other words, the city did not go as far as it might have gone. It might have prohibited the company from receiving more than 75 persons in a car at any particular time, whether there was a car following it or not; but by this proviso it relieved·the company from such obligation, and said that it might receive, under certain circumstances, more persons in a car than 75. While I think the proviso is entirely unjustifiable from the standpoint of public policy, yet I see nothing in it which would justify the court in declaring that it infringes the Constitution of the United States. It is not for the court to make regulations, that duty is intrusted to the legislative power. All the power which this court has in a case of this kind is simply to determine whether the Legislature has violated any constitutional provisions.

[19] The decisions to which I have heretofore called attention defining the powers of city councils have declared that where the regulations are for public convenience, public safety, or public health, they are proper regulations with which the companies must comply. Those decisions also hold that a company must comply with these regulations at its own expense, no matter what that expense is. It is readily seen that in the case of West Chicago Railroad v. Chicago, which involved the construction of a tunnel under the Chicago river, the expense must have been very large; yet that expense being required by the public in the interest of navigation, was cast upon the company and not upon the city. So in the New Orleans Case, the expense of the removal of the gas pipes in the streets of the city to accommodate the system of drainage must have been very great; yet that burden was cast upon the company and not upon the city. So it would seem that the question of the expense to which a company is put in order to comply with the terms of an ordinance, is not important.

But, waiving that point, I am asked to consider the expense to which this company would be put in complying with this ordinance, as far as it appears from the proper allegations in the bill. It is alleged in the bill that the ordinance would require the purchase of 2,400 cars, and the employment of many more employés, and that the total expense thereof would be over $14,000,000. But it is admitted that such estimate is based upon a construction of the ordinance which requires cars to be run on every line 300 feet apart during the hours named. That construction is not warranted by anything found in the ordinance. There is no ground for saying that the company is required to run cars 300 feet apart; and there is no ground for saying that it is required to buy cars sufficient in number to fulfill such a condition. This statement as to expense being based upon that assumption, and that assumption being incorrect, it follows that there is no allegation in the bill which the court can consider as to what the additional cost to the company would be, in order that it might comply with the terms of the ordinance. It certainly cannot cost anywhere near the sum alleged in the bill, because the sum mentioned is arrived at by an entirely inaccurate assumption.

[20] It is said that the case must be determined by the allegations in the bill. That is true, but where the allegations in the bill are based

upon a construction of the ordinance which, upon the face of that ordinance, is seen to be unwarranted, then it is the duty of the court to disregard the allegations of the bill.

The case from the city of Detroit was much commented on by counsel for the complainant. But all argument of that kind is completely answered, by reading the first section of the ordinance there in question. That section is as follows:

"Every person, firm or corporation operating cars upon the streets of the city of Detroit shall, between the hours of 5 o'clock a. m. and 8:30 o'clock a. m., and between the hours of 11:30 a. m. and 2 o'clock p. m. and between the hours of 4:30 o'clock p. m. and 6:30 o'clock p. m., Sundays excepted, provide a sufficient number of cars of sufficient capacity to accommodate and provide for the transportation of passengers, so that no car, in consequence of the failure to so provide, shall carry a greater number of passengers than the seating capacity of said car and one-half as many more."

That is practically as the ordinance here reads:

"Provided that it shall not be lawful for any car, when it is filled with passengers to or in excess of the number herein specified, to pass by without stopping for additional passengers, or decline to receive passengers; whenever so signaled, unless another car on said line and following in its rear is within a distance of two hundred feet."

That ordinance is very different from this ordinance. That ordinance also provided in section 5 that "any violation or failure to comply with the provisions of this ordinance shall be punished by a fine not to exceed one hundred dollars." That ordinance in one breath prohibited the company from carrying more than 75 passengers in a car, and in the next breath required it to carry more than 75 passengers in a car; so that it in fact required the company to carry any number of persons that might be got into a car, but for each person over 75 required the company to pay a fine. That is the legal effect of the ordinance. Under that ordinance, if a car has 75 persons in it, and a person wants to get on, the car must stop, and the company must take him on, but it must pay for that person a fine of between $5 and $100. The only way by which the company could be released from this liability was by running cars every 20 seconds. That would impose so tremendous a liability and obligation upon the company in the purchase of new equipment, that the ordinance was held by Judge Swan to be unreasonable and void. That decision seems to be based largely upon the fact that so large an equipment could not be provided within the time given by the ordinance. If we had here such an ordinance as that I should find no difficulty whatever in coming to the same conclusion as was reached in that case.

But here we have no such ordinance; we have an ordinance which prohibits the company from taking on more than 75 people. Under the terms of this ordinance, the company, as I have said repeatedly, is under no obligation whatever to take on more passengers. The company cannot be punished if it refuses to take on more. The only remedy is for the city to proceed by quo warranto to forfeit the company's charter for a failure to furnish sufficient accommodations for the traveling public.

The conclusion at which I have arrived is that this ordinance does not impair the obligation of the contract between the street railway company and the city, and does not deprive the company of its property without due process of law.

That being my conclusion, the result, of course, follows that the motion for a temporary injunction must be denied.